UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

TECHNEST HOLDING, INC.                :

                    Plaintiff,        :    06 Civ. 1665(HBP)

     -against-                        :    OPINION
                                           AND ORDER
DEER CREEK FUND LLC,                   :

                    Defendant.        :

----------------------------------X


          PITMAN, United States Magistrate Judge:


I.  Introduction


          This action arises out of attempts by defendant Deer

Creek Fund LLC ("Deer Creek"), a shareholder of plaintiff

Technest Holdings, Inc. ("Technest"), to sell unregistered shares

of Technest stock pursuant to Rule 144 in February 2006.

          Technest commenced this action seeking, inter alia, to

enjoin Deer Creek from selling its Technest shares.  Deer Creek

asserted various counterclaims.  Technest's claims against Deer

Creek were amicably resolved by a settlement in April 2006.

Remaining in this action are Deer Creek's counterclaims against

Technest for tortious interference with prospective economic

advantage, breach of the implied covenant of good faith and fair

dealing, and breach of the duty to process the transfer of stock.

Deer Creek seeks damages in the amount of $543,342.19 plus

interest.  Technest contends that Deer Creek is not entitled to

damages, and that even if it were, those damages would have to be reduced because Deer Creek has failed to mitigate its damages.

The parties consented to my exercising plenary jurisdiction over this matter pursuant to 28 U.S.C. § 636(c), and the matter was tried before me, without a jury, on April 8 and 9, 2008. Based on the testimony and other evidence offered at trial and the parties' pre- and post-trial submissions, I make the following findings of fact and conclusions of law.

## II. Findings of Fact

### A. Background

1. Technest is a public company whose stock is traded on the "over-the-counter" market. Technest is in the business of developing security technologies (Witness Statement of Gino Pereira, dated Jan. 25, 2007, ("Pereira Stmnt."), ¶¶ 1, 2; Stipulated Facts[1] ¶ 3).

2. Technest is incorporated under the laws of Nevada and has its principal place of business in Boston, Massachusetts (Joint Pre-Trial Order, dated January 9, 2007, ("Pre-Trial Order"), at 4).

---

[1]"Stipulated Facts" refers to the parties' joint statement of undisputed facts, set forth in the Joint Pre-Trial Order, at Page 9. "Tr." refers to the trial transcript. "Dep.," preceded by a name, refers to the transcript of the deposition of the witness identified in the citation. Finally, "PX" and "DX" refer to plaintiffs' exhibits and defendant's exhibits, respectively.

3. Suzette O'Connor is Co-General Counsel of Technest (Witness Statement of Suzette O'Connor, dated Jan. 25, 2007, ("O'Connor Stmnt."), ¶ 1).

4. Gino Pereira is the Chief Financial Officer of Technest and a member of Technest's Board of Directors (Pereira Stmnt. ¶ 1).

5. Deer Creek is a private investment fund and a New York limited liability company. No member of Deer Creek is a resident of Nevada or of Massachusetts (Pre-Trial Order at 4).

6. Marc Sharinn and Col Wrynn created and now manage Deer Creek (Witness Statement of Marc Sharinn, dated Jan. 9, 2007, ("Sharinn Stmnt."), ¶¶ 6, 8, 9).

B. Deer Creek's
   Investment in Technest

7. On February 14, 2005 Deer Creek and a number of other investors acquired Technest securities through a private placement. At that time Deer Creek invested $500,000.00 in Technest (Stipulated Facts ¶¶ 5, 6).

8. In exchange for its investment, Deer Creek, along with the other investors, received "units" consisting of various classes of shares of Technest stock and warrants to purchase additional shares pursuant to a "Securities Purchase Agreement" (Stipulated Facts ¶ 7). Deer Creek received 114,942 "units," each consisting of one share of Technest's Series B Preferred

Stock, one share of Technest's Series C Preferred Stock, and one warrant to purchase 211.8 shares of Technest's common stock. The Series C Preferred Stock was convertible, "on certain terms and conditions," into shares of Technest's common stock (Stipulated Facts ¶¶ 8, 9, 10; Sharinn Stmnt ¶¶ 12, 13).

9. On January 19, 2006, Deer Creek converted its Series C Preferred Stock into 114,942 shares of Technest's common stock, which could be traded over the counter. Deer Creek also exercised its rights under the warrant to acquire an additional 52,053 shares of Technest's common stock, giving Deer Creek a total of 166,995 shares of Technest's common stock (Stipulated Facts ¶¶ 11, 13; Sharinn Stmnt. ¶¶ 14, 15).

10. The Securities Purchase Agreement ("SPA"), dated February 14, 2005, governed the "units" acquired at that time by Deer Creek and the other investors, as well as the common stock Deer Creek subsequently acquired. Section 16 of the SPA, entitled "Entire Agreement," provided:

> This Agreement (including the attachments hereto) contains the entire agreement of the parties with respect to the subject matter hereof and supercedes and is in full substitution for any and all prior oral or written agreements and understandings between them related to such subject matter, and no party hereto shall be liable or bound to the other party hereto in any manner with respect to such subject matter by any representations, indemnities, covenants or agreements except as specifically set forth herein

(SPA, annexed as PX 1 & DX P, § 16).

11.  The SPA was signed by Technest and Deer Creek (SPA at 16, 17).

12.  The parties also executed a Registration Rights Agreement as an attachment to the SPA (Registration Rights Agreement, annexed as PX 2 & DX Q, ("RRA"); Stipulated Facts ¶ 16; Tr. at 118).

13.  The RRA provided that "[o]n or prior to each Filing Date, the Company shall prepare and file with the [SEC] a 'Shelf' Registration Statement covering the resale of the Registrable Securities on such Filing Date for an offering to be made on a continuous basis pursuant to Rule 415" (RRA ¶ 2).  The "Filing Date" referred to in the RRA was May 2, 2005 (Stipulated Facts ¶¶ 18, 19; Sharinn Stmnt. ¶¶ 21, 22).

14.  The RRA defines "Registration Statement" as "the registration statements required to be filed hereunder, including (in each case) the Prospectus, amendments and supplements to such registration statement or Prospectus, including pre- and post-effective amendments, all exhibits thereto, and all material incorporated by reference or deemed incorporated by reference in such registration statement" (RRA at 2; Stipulated Facts ¶ 22).

15.  Technest did not file a registration statement by the May 2, 2005 "Filing Date" because it did not have the re-sources to do so at that time (Tr. at 348-49).  Rather, Technest filed a registration statement on November 22, 2005; the regis-

tration statement did not became effective until February or
March 2007 (Tr. at 349-50).

16.   In the event Technest failed to obtain an effec-
tive registration statements by the "Filing Date," Section 2(b)
of the RRA provided for liquidated damages, stating, in pertinent
part,

> [i]f (i) a Registration Statement is not filed on or
> prior to its Filing Date, or (ii) a Registration State-
> ment filed or required to be filed hereunder is not
> declared effective by the Commission by its Effective-
> ness Date, . . . then, on each such Event Date[2] and
> every monthly anniversary thereof until the applicable
> Event is cured, the Company shall pay to each Holder an
> amount in cash (or shares of Common Stock . . .), as
> liquidated damages.

(RRA § 2(b)).

17.   Section 2 of the RRA was amended on September 30,
2005 to provide that liquidated damages would be paid only in
shares of Technest common stock "valued at 90% of the average of
the trailing 5 trading days' closing prices before payment" (RRA
Amendment No. 1, annexed as PX 3; Stipulated Facts ¶ 25).

18.   The RRA also provided:

> [i]n connection with the sales of Registrable Securi-
> ties pursuant to a Registration Statement, each Holder
> agrees as follows:
>
> Each Holder shall not, and shall cause all persons to
> whom such Holder may transfer Registrable Securities
> not to, sell more than 25% of the Registrable Securi-

---

[2]The Event Date is the date on which the failure or breach
occurs (RRA § 2(b)).

ties acquired by such Holder pursuant to the Purchase
Agreement in any period of 20 consecutive trading days

(RRA § 4(c); Stipulated Facts ¶ 21; Sharinn Stmnt ¶ 26).

19.  Under Section 5 of the Securities Act of 1933

("Securities Act"), all sales of securities must be made pursuant

to a registration statement or qualify for an exemption from the

registration requirement.  15 U.S.C. § 77e(a).

20. Securities Act Rule 144 ("Rule 144") provides an

exemption from the registration requirement.  The principal

requirements of Rule 144 are that

the securities must have been held by the purported
seller for at least one year; the number of shares to
be sold during any three-month period cannot exceed the
greater of one percent of the outstanding shares in
that same class or of the average weekly trading volume
during the preceding month for a share class as listed
on an exchange; and a notice must be filed with the SEC
for sales to exceed 500 shares or $10,000 in total
transactions in any three-month period.

S.E.C. v. Universal Exp., Inc., 475 F. Supp.2d 412, 431-32

(S.D.N.Y. 2007).

21.  Neither the SPA nor the RRA contained any provi-

sions limiting the number of shares Deer Creek could sell under

Rule 144 or in the absence of a registration statement.

C.  Deer Creek Attempts to
    Sell Its Technest Shares

22.  As of February 15, 2006, Rule 144(e) permitted

Deer Creek to sell up to 157,163 of its Technest shares in any 90

7

day period notwithstanding the absence of an effective registration statement (Stipulated Facts ¶¶ 29, 30; Sharinn Stmnt. ¶¶ 20, 24; see 17 C.F.R. § 230.144(e)). At that time Technest was a thinly traded company, and its stock was traded "over-the-counter" with a quoted price of $10.85 per share (Stipulated Facts ¶¶ 31-33).

23. On or about February 13, 2006, Deer Creek entered into discussions with Erik Brous, a licensed securities broker at Axiom Capital Management, Inc. ("Axiom"), concerning Axiom's selling 157,163 of Deer Creek's Technest shares to certain customers as a block transaction after the Rule 144 one-year holding period expired on February 15 (Sharinn Stmnt. ¶¶ 54-57; Tr. at 5-7, 53).

24. On February 13, 2006 and the following days, Brous, who was experienced in brokering block trades, contacted several "relationship accounts" that he believed would be interested in purchasing a block of Technest stock at approximately $7.00 per share (Tr. at 7-10, 13-14). Among these were Howard Fischer of Basso Capital, Chris Casey of Night Capital, LP, Yoav Roth of SRG Capital, Rich Abbe of Iroquois Capital, LP, Jim Andrew of "ACC" and Sean Deson of Baytree Capital (DX O; DX N; DX M; DX S; Tr. at 24-25, 27; Brous Dep. at 35, 53, 60, 61). Brous' discussions with these potential purchasers can be summarized as follows:

a. When Brous informed Fischer on February 14 that Axiom had 180,000 shares of Technest stock available for a block trade at $7.00 per share, Fischer requested that Brous keep him informed (DX N).

b. After Brous informed Casey on February 21 that Axiom's clearing broker was "cleaning up the stock" and that the trade could be done within the next day, Casey instructed Brous to complete Night Capital's purchase of $100,000 worth of Deer Creek's Technest shares at $7.15 per share (DX M; Tr. at 8).

c. Roth of SRG Capital also expressed interest in purchasing a block of Technest shares, and on February 21 Brous informed Roth that Axiom might have shares available for SRG (DX S; Tr. at 26-27).

d. On February 21 Brous informed Abbe that there were about 50,000 shares of Technest available at $7.10 per share, and Abbe requested that Brous contact Iroquois Capital's "trader" (Tr. at 27).

e. On February 21, 2006, Jim Andrew indicated to Brous that ACC might not purchase Deer Creek's Technest shares unless ACC could find a buyer for the shares from ACC (Tr. at 24-25).

f.  Though Deson had expressed interest in pur-
chasing a block of Technest shares, on February 22 Brous was
still not sure how interested Deson was (DX O; Tr. at 28).

25.  Brous testified that by February 22, 2006, there
was sufficient interest from prospective buyers to complete a
sale of Deer Creek's 157,163 shares of Technest common stock (Tr.
at 10, 47-49; DX V; DX W).  He had a specific order from Night
Capital and believed other interested buyers were just waiting
for him to tell them how many shares were available (Tr. at 49).

26.  Axiom expected to cross the trades at $7.05 per
share; Axiom would charge Deer Creek $.10 per share, giving Deer
Creek a net of $6.95 per share (DX W).

27.  On February 22, 2006, in anticipation of the sale,
Deer Creek opened an account with Axiom into which it deposited
its Technest stock (PX 14; Sharinn Stmnt. ¶ 60; Martino Dep. at
10-11; Sharinn Dep. at 67).

28.  Though the prospective buyers did not formally
commit to purchasing Deer Creek's Technest stock, (Tr. at 18-19;
DX M; DX N; DX O; DX W; Martino Dep. at 101), and Deer Creek was
not formally bound to sell it, (Tr. at 23-24; Martino Dep. at
101), Axiom typically relies on similarly informal arrangements
with sellers and purchasers when it brokers transactions (Tr. at
55).

D.  Technest's Reaction to
    Deer Creek's Intention to Sell

29.  Prior to February 15, 2006, Technest was aware
that investors who had purchased stock in connection with the
February 15, 2005 offering would, on February 15, 2006, be able
to sell those shares pursuant to Rule 144 (Tr. at 92; O'Connor
Dep. at 41).

30.  Technest was concerned about having a large volume
of its stock enter the market at that time, as such sales would
depress Technest's stock price (Tr. at 93; Pereira Stmnt. ¶ 15).
Technest was concerned about the price of its stock because
Technest was seeking, among other things, to be registered on the
NASDAQ (O'Connor Stmnt. ¶ 6; Tr. at 93-94), and registry on the
NASDAQ requires a "healthy" stock price (Tr. at 93).

31.  On February 15, 2006, Robert Tarini, Technest's
Chief Executive Officer, instructed O'Conner to advise him of any
requests to sell Technest stock "in the coming weeks" (Tr. at 94;
DX F).  That same day, O'Connor informed Tarini and Pereira that
she had been in communication with a broker for Deer Creek, that
Deer Creek wanted to sell its 166,995 shares of common stock,[3]
and that the broker advised her that it would not participate in
a sale until Technest filed its quarterly report (DX H).

_____

[3]Prior to Axiom, another broker, Krissy Dove of vFinance,
contacted Technest concerning Deer Creek's shares (Tr. 251-52,
255).

32. Technest subsequently called between three and ten "company meetings and discussions to establish what [Technest's] belief was" concerning how the volume restrictions in section 4(c) of the RRA would apply to Deer Creek's intended sales (Tr. at 331, 346, 354).

33. O'Connor was not employed by Technest in February 2005, when the SPA and RRA were executed; she testified that in February 2006, she spoke with her co-general counsel and other employees at those meetings to understand Technest's intentions when the SPA and RRA were drafted (Tr. at 170-71).

34. On or about February 21, 2006, Deer Creek's counsel informed O'Connor that Deer Creek was planning to sell its Technest shares without regard to the volume restrictions described in section 4(c) of the RRA (O'Connor Stmnt. ¶ 2).

35. Later that day, O'Connor sent an email to Deer Creek and the other investors who purchased stock on February 15, 2005 stating, in pertinent part,

> In connection with sales of your common stock of Technest Holdings, Inc., we wanted to confirm that you were aware of the selling restriction set forth in the Registration Rights Agreement . . . . We also wanted to confirm your awareness of the volume restrictions under Rule 144 promulgated under the Securities Act of 1933, as amended, for companies traded on the Over-the-Counter Bulletin Board.
>
> Section 4(c) of the Registration Rights Agreement provides the following selling restriction: Each holder shall not, and shall not cause all persons to whom such Holder may transfer Registrable Securities not to, sell more than 25% of the Registrable Securi-

ties acquired by such Holder pursuant to the Securities
Purchase Agreement dated February 14,2005 (the "Pur-
chase Agreement") in any period of 20 consecutive
trading days.  The term Registrable Securities in-
cludes, among other things, those shares of common
stock issued upon conversion of Technest's Series C
Preferred Stock, those shares of Common stock issued
upon exercise of warrants issued pursuant to the Pur-
chase Agreement and shares issued as payment of partial
liquidated damages.  In order to manage compliance with
this restriction, we are requesting that each holder
limit their sales of common stock to a daily amount of
1.25% of their Registrable Securities. Therefore, we
are asking that you sell no more than 3,130 shares per
day (subject to Rule 144(e)) based on your total
Registrable Securities being 250,426

(O'Connor Stmnt. ¶¶ 4, 5; DX K ("Restrictions Email")).


    E.  Technest's
       <u>Communications with Axiom</u>


    36.  On February 23, 2006, Axiom's president, Mark
Martino, contacted O'Connor by telephone, informed her he was a
broker for Deer Creek and inquired whether any restrictions would
apply to Deer Creek's proposed sale of Technest shares (Tr. at
56-58, 97; Martino Dep. at 72).

    37.  O'Connor then forwarded the Restrictions Email to
Martino and to the staff of Bear Sterns, Axiom's clearing broker
(Tr. at 98, 262; Martino Dep. at 72).

    38.  Later that day, O'Connor told Martino that the
restrictions contained in section 4(c) of the RRA would apply to
Deer Creek's proposed sale (Tr. at 58-59).  Martino informed
O'Connor that Axiom was in a position to sell 157,163 shares, and

asked O'Connor what would happen if Deer Creek and Axiom sold more than the 3,100 shares allowable under section 4(c) of the RRA.  O'Connor told Martino that Technest would not remove the restrictive legends on more than 3,100 of the shares, thereby effectively preventing Axiom from concluding the trades (Tr. at 59, 63, 73-74; Martino Dep. at 74).

F.   Axiom Withdraws
     From the Block Sale

39.   After the foregoing discussions with Technest, Axiom decided not to sell Deer Creek's block of approximately 157,163 shares of Technest stock because there was too much risk involved -- if Technest removed the legends from only 3,130 of those shares, Axiom would be compelled to purchase unrestricted shares in the market place to close the transaction, potentially leaving Axiom with a large receivable from Deer Creek (Tr. at 61-62; Martino Dep. at 74-75).

40.   Martino testified that but for O'Connor's February 23 representations concerning the volume restrictions in the RRA and Technest's representations that it would not remove the legends from more than 3,100 shares per day, Axiom would have completed the sale of 157,163 shares for approximately $7.00 per share (Tr. at 62-63).

41.   Brous subsequently informed the prospective buyers that the sale of Deer Creek's Technest shares could not be a

block trade into the open market.  Rather, it would have to be a private sale, with the buyers subject to a number of  restrictions on the resale of the stock (Tr. at 29-30; PX 34).

42.  Axiom did not inquire of the buyers whether they would be willing to purchase restricted Technest shares through a private sale because Martino and Brous were confident that the buyers would not be interested in such a transaction, and that if such a sale were possible, the price would be much lower (Tr. at 36-37, 47, 79).

43.  After Brous informed the buyers that the shares were subject to selling restrictions, none of the buyers expressed any further interest in purchasing the shares (Tr. at 37).

44.  Brous specifically advised at least one prospective buyer to "walk away" from the transaction (Tr. at 38).

G.  Technest Sells According
    to the RRA's Volume Limitations

45.  On February 24 Deer Creek started selling its Technest shares at a rate of no more than 3,130 shares per day (DX EE; Martino Dep. at 75).

46.  On February 27, 2006 Technest's shareholders amended Section 4 of the RRA to provide that the volume restrictions in section 4(c) would apply to "Registrable Securities

[sold] pursuant to a Registration Statement or pursuant to Rule 144 . . ." (PX 5).

47. Deer Creek continued to sell its Technest shares in accordance with the volume restrictions of RRA section 4(c) until January 2007 (DX EE).

48. As a result of Technest's failure to obtain a registration statement on time, Deer Creek continued to receive shares of Technest stock pursuant to the liquidated damages provision of section 2(b) of the RRA after Deer Creek commenced selling its shares in February 2006 (Tr. at 190; Pereira Stmnt. ¶ 19).

H. <u>Proceedings to Date</u>

49. Technest commenced this action on March 2, 2006, alleging that Deer Creek was threatening to sell its entire Technest position in violation of the amended RRA and in violation of Rule 144 (Complaint, Docket Item 1, ¶¶ 1-2). The Complaint sought to enjoin Deer Creek from selling its Technest shares except as permitted under the amended RRA and Rule 144 (Complaint ¶¶ 3-4). The Complaint also sought a declaration that the February 27, 2006 amendment to the RRA, which Deer Creek had challenged, was valid and enforceable (Complaint ¶ 5).

50. In its answer, Deer Creek contended that the February 27, 2006 amendment of the RRA was invalid and unenforce-

able, and it asserted counterclaims for interference with con-
tract, market manipulation, and breach of the implied covenant of
good faith and fair dealing (Answer, Docket Item 17, ¶¶ 5-7, 47-
66).

51. On April 28, 2006 Technest and Deer Creek executed
a settlement agreement, pursuant to which Technest withdrew its
claims. Thus, the only claims remaining in the case are Deer
Creek's counterclaims.

52. On May 30, 2006, Deer Creek filed an amended
answer re-asserting counterclaims for interference with contract,
market manipulation, and breach of the implied covenant of good
faith and fair dealing (Amended Answer, Docket Item 21, ¶¶ 42-
55).

53. Deer Creek argues in its Pretrial Memorandum of
Law: (1) Technest tortiously interfered with Deer Creek's pro-
spective contractual relationship with Axiom when O'Connor (a)
sent Axiom and Bear Sterns the intentionally misleading February
21 Restrictions Email, giving the incorrect impression that the
volume restrictions in the RRA applied to Deer Creek's proposed
sales and (b) advised Axiom that Technest's transfer agent would
not honor sales in excess of the volume limitation set forth in
the RRA; (2) Technest's actions were intended to deprive Deer
Creek from receiving the fruits of the SPA -- the ability to sell
shares in accordance with the terms of the SPA and RRA -- thus

breaching the implied covenant of good faith and fair dealing;
(3) Technest breached its common law duty to process the transfer
of Deer Creek's stock when Technest determined it would not
permit Deer Creek's sale of shares made pursuant to Rule 144 and
when O'Connor interfered with the Deer Creek/Axiom transaction;
and (4) because the SPA and the RRA are fully integrated docu-
ments, the parol evidence rule prohibit's Technest from introduc-
ing evidence that the parties to the SPA and RRA intended that
Deer Creek would only sell its shares pursuant to a registration
statement and subject to the volume restrictions in the RRA
(Docket Item 35).

       54.   Technest argues in its Pretrial Memorandum of Law
that Deer Creek cannot sustain its claim of tortious interference
because (1) Deer Creek did not have "anything close to a contract
with any potential buyers [of its shares];" (2) Technest was not
aware of Deer Creek's potential sales and (3) O'Connor's repre-
sentations to Axiom did not amount to culpable conduct, but
rather, constituted an attempt to persuade, motivated, at worst,
by economic self-interest.  Technest also contends that Deer
Creek cannot sustain a claim for breach of the implied covenant
of good faith and fair dealing because (1) Deer Creek and the
other parties to the SPA and the RRA expected Technest to have
obtained a registration statement within one year and, hence, did
not reasonably expect to be able to sell shares without the

volume restrictions set forth in section 4(c) of the RRA; (2) the fact that the RRA could be amended at any time by a majority of shareholders to impose volume restrictions on sales of shares that were not made pursuant to a registration statement means Technest acted within its contractual rights and (3) Technest acted in good faith consistent with its interpretation of the SPA and the RRA (Docket Item 36).

III.  Conclusions of Law and Findings
      of Fact that are Dependent Upon
      <u>the Applicable Principles of Law</u>

  A.  <u>Jurisdiction</u>

       55.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties.  Technest is a Nevada corporation with its principal place of business in Boston, Massachusetts; Deer Creek is a New York limited liability company whose principals do not reside in either Nevada or Massachusetts.  The amount in controversy exceeds $75,000 exclusive of interest.

       56.  This Court has personal jurisdiction over both parties, both of whom consented to such jurisdiction in the SPA (PX 1 § 14).

       57.  No party has raised any issue as to the propriety of venue in this district.

B.  <u>Choice of Law</u>

      58.  The SPA provides for the application of New York state law (SPA § 14).  Because no party disputes the applicability of New York substantive law here, I shall apply New York law to Deer Creek's counterclaims.

C.  Tortious Interference with
    <u>Prospective Business Relations</u>

      59.  Under New York law,

> the elements of a claim for tortious interference with prospective business relations are: (1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship.

<u>Nadel v. Play-by-Play Toys & Novelties, Inc.</u>, 208 F.3d 368, 382 (2d Cir. 2000); <u>see</u> <u>also</u> <u>Carvel Corp. v. Noonan</u>, 350 F.3d 6, 17 (2d Cir. 2003); <u>Henneberry v. Sumitomo Corp. of Am.</u>, 415 F. Supp.2d 423, 467-68 (S.D.N.Y. 2006).

1.  <u>Existing Business Relationship</u>

      60.  To satisfy the first element of its tortious interference claim, Deer Creek must have had "some particular, existing business relationship through which [it] would have done business but for the allegedly tortious behavior."  <u>Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.</u>, 96 Civ. 3839 (MBM), 1997

WL 166497 at *7 (S.D.N.Y. Apr. 9, 1997); accord Henneberry v. Sumitomo Corp. of Am., supra, 415 F. Supp.2d at 468; see also Envirosource, Inc. v. Horsehead Res. Dev. Co., 95 Civ. 5106 (AGS), 1996 WL 363091 at *14 (S.D.N.Y. July 1, 1996) ("A general allegation of interference with customers without any suffi- ciently particular allegation of interference with a specific contract or business relationship will not withstand a motion to dismiss.").

      61.  Deer Creek established the existence of a business relationship with Axiom with the testimony of Martino, Brous and Sharinn, as well as documentary evidence of Brous' communications with potential purchasers of Deer Creek's Technest shares and of Deer Creek's account with Axiom (See e.g. Tr. at 5-8, 18-24, 47- 49, 53; Sharinn Stmnt. ¶¶ 54-57; Brous Dep. at 35, 53, 60, 61; Martino Dep. at 10-11; DX M; DX N; DX O; PX 14).

      62.  The evidence demonstrates that prior to February 23, 2006, Deer Creek and Axiom arranged for Axiom to broker the sale of 157,163 of Deer Creek's Technest shares with net proceeds to Deer Creek of $6.95 or $7.00 per share (Sharinn Stmnt. ¶¶ 54- 59; Tr. at 7-10, 13-14, 24-25, 27; Sharinn Dep. at 67; Martino Dep. at 10-14; PX 14; DX M; DX N; DX O; DX S; DX V; DX W).

      63.  Martino and Brous, two disinterested witnesses, confidently and credibly testified that between February 13 and February 23, 2006, Axiom had contacted several interested poten-

tial purchasers and that, by February 23, there was sufficient interest for Axiom to commence effectuating the sale of all 157,163 shares as a block (Tr. at 47-49, 62-63).

64.   Technest argues that because these potential purchasers did not make "firm commitments" to purchase the shares, Deer Creek did not have a business relationship with which Technest could have tortiously interfered (Plaintiff's Post-Trial Memorandum of Law, Docket Item 50, ("Plaintiff's Post-Trial Mem.") at 2).  This argument is not persuasive.

65.   A claim for tortious interference with prospective business relations does not require a claimant to have had a binding commitment.  Rather all that need be shown is a "business . . . or customary relationship not amounting to a formal contract."  Scutti Enters., LLC v. Park Place Entm't Corp., 322 F.3d 211, 215 (2d Cir. 2003) (internal quotation marks and citations omitted); see also PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 270 (2d Cir. 1987) ("[A] claim of tortious interference with prospective economic advantage usually involves interference with a business relationship not amounting to a contract . . . .").  Hence, Deer Creek was not required to establish that it had "firm commitment[s]" to satisfy this element of the claim.

66.   The testimony of Martino, Brous and Sharinn, along with Brous' email correspondence dated February 13 through

February 23 sufficiently demonstrate that Deer Creek had a
potentially profitable business relationship with Axiom, suffi-
cient to meet this element of the tort.

> 2. Technest Knew of, and
>    Intentionally Interfered
>    With, Deer Creek's Plans
>    to Sell Through Axiom

67. Technest contends that it could not have inten-
tionally interfered with Deer Creek's plans to sell its Technest
shares because Technest did not know of those plans on the date
of the alleged interference, February 23, 2006 (Plaintiff's Post-
Trial Mem. at 3).

68. O'Connor testified that although two brokers had
contacted her in February 2006 regarding Deer Creek's shares,
neither broker mentioned imminent plans to sell the shares, and
she believed that these brokers were merely engaging in general
"due diligence" in preparation for selling the shares on some
unspecified future date (Tr. at 169, 250). Other credible
evidence contradicts this argument.

69. On February 14, 2006, O'Connor exchanged email
with another broker for Deer Creek, Krissy Dove at vFinance (Tr.
at 251; DX I). O'Connor asked Dove whether Deer Creek was
"looking to sell . . . all [166,995 of its Technest common
shares] now?" to which Dove responded "[y]es" (Tr. at 251-52; DX
I).

70.   O'Connor also admitted that on February 21, 2006, Deer Creek's counsel, David Bolton, Esq., informed her that Deer Creek was planning to sell its shares without regard to the volume restrictions in the RRA because Deer Creek did not believe those restrictions applied to sales pursuant to Rule 144 (O'Connor Stmnt. ¶ 2).

71.   In addition, during O'Connor's second conversation with Martino on February 23, Martino informed O'Connor that Axiom was able to sell 157,163 of Deer Creek's Technest shares (Tr. at 74).   O'Connor then re-asserted her contention that Technest would not issue unlegended certificates for more than 3,100 shares per day pursuant to the volume restrictions set forth in section 4(c) of the RRA (Tr. at 76).

72.   Thus, the credible evidence contradicts Technest's contention that it did not know Deer Creek was seeking to sell 157,163 of its shares on February 23.

73.   Hence, despite her testimony to the contrary, I conclude that O'Connor was aware that Deer Creek was seeking to have Axiom sell as much of its Technest stock as it could under Rule 144 when she represented to Martino that the sales would be subject to the volume restrictions in section 4(c) of the RRA.

74.   I also conclude that Technest's communications with Axiom were intentionally calculated to prevent Deer Creek from selling unrestricted shares, satisfying the second element

of this claim.  My reasoning for this finding is discussed in the following section concerning the wrongful means that Technest employed to interfere with the relationship.

        3.   Technest Employed
            <u>Wrongful Means</u>

75.   The New York Court of Appeals recently clarified the nature of the "wrongful means" necessary to satisfy the third element of tortious interference with prospective business relations.  The Court concluded that generally, the conduct must amount to a crime or an independent tort, or must have been engaged in "for the sole purpose of inflicting intentional harm on plaintiffs."  <u>Carvel Corp. v. Noonan</u>, 3 N.Y.3d 182, 190, 818 N.E.2d 1100, 1103, 785 N.Y.S.2d 359, 362 (2004); <u>accord</u> <u>Friedman v. Coldwater Creek, Inc.</u>, 551 F. Supp.2d 164, 169 (S.D.N.Y. 2008); <u>Henneberry v. Sumitomo Corp. of Am.</u>, <u>supra</u>, 415 F. Supp.2d at 468; <u>see also</u> <u>NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.</u>, 215 A.D.2d 990, 990-91, 628 N.Y.S.2d 408, 410 (3d Dep't 1995).

76.   "Actions taken, at least in part, to promote or advance [defendant's] economic self-interest are, by definition, not taken for the sole purpose of harming [plaintiff]."  <u>A & A Jewellers Ltd. v. Bogarz, Inc.</u>, 05 Civ. 0020E (SC), 2005 WL 2175164 at *2 (W.D.N.Y. 2005); <u>accord</u> <u>Vinas v. Chubb Corp.</u>, 499 F. Supp.2d 427, 434-35 (S.D.N.Y. 2007).

77.   Technest was concerned in February 2006 that a sale of a large block of its shares, such as the one Deer Creek was contemplating, would depress its stock price and "jeopardize Technest's ability to engage in future financings or to use its stock as consideration in an acquisition of another company" (Pereira Stmnt. ¶ 15; Tr. 93-94).   Thus, since Technest had an economic interest in preventing Deer Creek's sale of its Technest stock, Technest could not have interfered with the sole motive of harming Deer Creek.

78.   Deer Creek can, however, satisfy this element of its claim if Technest's conduct amounted to an independent tort or crime, or constituted "extreme and unfair economic pressure." See Vinas v. Chubb Corp., supra, 499 F. Supp.2d at 435 (S.D.N.Y. 2007), citing Masefield AG v. Colonial Oil Indus., 05 Civ. 2231 (PKL), 2006 WL 346178 at *5-*6 (S.D.N.Y. Feb. 15, 2006).

79.   Deer Creek asserts that "Technest's use of the Restrictions [E]-mail, and the discussions Ms. O'Connor had with Mr. Martino, constituted fraud and misrepresentation" (Defendant's Proposed Findings of Fact and Conclusions of Law, Docket Item 32, ¶ 6).

80.   Fraud or a tortious misrepresentation satisfies the third element of a claim for tortious interference with prospective business advantage.   Randolph Equities, LLC v. Carbon Capital, Inc., 05 Civ. 10889 (PAC), 2007 WL 914234 at *5

(S.D.N.Y. Mar. 26, 2007) <u>citing</u> <u>Carvel Corp. v. Noonan,</u> <u>supra</u>, 350 F.3d at 17 (Defendant's false representation to a third party that defendant would not finance plaintiff's deal, when defendant knew the third party would not complete the deal if defendant did not intend to finance it, satisfied the third element of plaintiff's tortious interference claim.).

81. Under New York law, a claim for fraudulent misrepresentation requires a showing that "the defendant knowingly or recklessly misrepresented a material fact, intending to induce the [listener's] reliance, and that the [listener] relied on the misrepresentation and suffered damages as a result." <u>Merrill Lynch & Co. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 181 (2d Cir. 2007); <u>see</u> <u>also</u> <u>Wynn v. AC Rochester</u>, 273 F.3d 153, 156 (2d Cir. 2001); <u>Lama Holding Co. v. Smith Barney, Inc.</u>, 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373, 646 N.Y.S.2d 76, 80 (1996).

82. There is no dispute that on February 23, 2006 Deer Creek was "permitted to sell 157,163 of the [Technest] Shares in any 90 day period pursuant to the exemption provided by SEC Rule 144, 17 C.F.R. 230.144" (Stipulated Facts ¶ 30).

83. O'Connor admits that prior to the amendment of section 4(c), the RRA only imposed restrictions on sales pursuant to a registration statement, (RRA § 4; Tr. 242-43, 247), and there is no dispute that Technest did not obtain a registration statement until after February 2006 (Tr at 349-50).

84.  The Restrictions Email that O'Connor transmitted to Martino on February 23, 2006, however, omitted the qualifying language in section 4, which unambiguously limited the application of the 3,130 shares-per-day sales restriction set forth in section 4(c) to sales "pursuant to a registration statement" (RRA § 4(c); Tr. at 98; DX L).  As a result the Restrictions Email falsely represented that the volume restrictions in section 4(c) applied to Sales under Rule 144.

85.  During a later conversation with Martino, O'Connor told Martino that the RRA restricted the sale of Deer Creek's shares, and that if Deer Creek sold more than the 3,130 shares that the RRA permitted, Technest would enforce the RRA by refusing to remove the restrictive legends from those securities (Tr. at 59, 256-57).

86.  Thus, O'Connor's representations to Martino regarding RRA section 4's language and the applicability of section 4(c)'s volume restrictions to Deer Creek's proposed transactions were false.

87.  In addition, Technest's contentions that O'Connor's false representations to Martino were the product of her honest misinterpretation of the RRA and were made in good faith are unpersuasive.

88.  A claimant can establish scienter to commit fraud (1) by showing that defendant had motive and opportunity to

commit a fraud and (2) by establishing facts that "constitute
strong circumstantial evidence of conscious misbehavior or
recklessness." Randolph Equities, LLC v. Carbon Capital, Inc.,
supra, 2007 WL 914234 at *7 (discussing the wrongful means
element in a claim for tortious interference with prospective
business relationships), citing Kalnit v. Eichler, 264 F.3d 131,
138 (2d Cir. 2001).[4]

    89. Technest had a motive to misrepresent the volume
restrictions to Deer Creek's brokers because, as Technest has
admitted, as of February 15, 2006 it was concerned that a rapid

---

[4]In response to my request at the conclusion of trial, the
parties each submitted a Post-Trial Memorandum of Law addressing
the issue of what level of scienter is required to support a
claim of tortious interference with a prospective business
relationship where the wrongful conduct at issue is fraudulent
misrepresentation. Technest's memorandum claimed that three
opinions from this district with, what Technest claims were,
strikingly similar facts to this case suggest that Technest did
not act with the requisite scienter. I disagree. Two of those
cases, Vinas v. Chubb Corp., supra, 499 F. Supp.2d 427, and
Berwick v. New World Network Int'l Ltd., 06 Civ. 2641 (JGK), 2007
WL 949767 (S.D.N.Y. Mar. 28, 2007) are not instructive in this
regard because the plaintiffs in those cases alleged that the
defendants' wrongful conduct was the making of defamatory false
statements. The third case, Friedman v. Coldwater Creek, Inc.,
551 F. Supp.2d 164 (S.D.N.Y. 2008), in which the Honorable
Loretta Preska, United States District Judge, concluded that
"misrepresentations do not constitute 'wrongful means' per se
. . . ." is only minimally instructive. 551 F. Supp.2d at 171.
In Friedman, Judge Preska found that the allegedly false
statements could not amount to wrongful conduct because
"[p]laintiff [did] not argue that the statements . . . amount[ed]
to an independent tort . . . ." 551 F. Supp.2d at 171. Here,
Deer Creek has alleged that Technest's representations
constituted fraud (Defendant's Proposed Findings of Fact and
Conclusions of Law ¶ 6). Hence, these three cases do not help
Technest.

infusion of shares into the market would depress the price of its stock to its detriment (Tr. at 93-94; O'Connor Stmnt. ¶ 6; Pereira Stmnt. ¶ 15).

90. Technest had the opportunity to make fraudulent representations when Martino consulted O'Connor about potential volume restrictions.

91. I find that the evidence also establishes that O'Connor knowingly or recklessly misrepresented the applicability of the volume restrictions in order to prevent Deer Creek from selling 157,163 shares of its Technest stock in February 2006.

92. O'Connor testified that she was an experienced securities attorney and had drafted and reviewed numerous securities contracts during her career (Tr. at 238).

93. O'Connor further testified that prior to drafting the Restrictions Email, which she subsequently forwarded to Martino, she had studied the RRA and was aware of section 4's qualifying language that the sales restrictions in section 4(c) only applied to shares being sold "pursuant to a Registration Statement" (Tr. at 242-43, 247-48, 271). Furthermore, O'Connor was aware that as of February 2006 Technest did not have an effective registration statement (Tr. at 247).

94. O'Connor admitted that she intentionally omitted section 4's qualifying language from the Restrictions Email (Tr. at 248).

95.   O'Connor also testified that as co-General Counsel at Technest, she had reviewed the SPA and that, during her career, every securities purchase agreement she drafted or reviewed contained an integration clause (Tr. at 273-75).  Thus, O'Connor knew or should have known that the SPA contained an integration clause.

96.   Yet, O'Connor testified that, despite the integration clause and the express language of section 4, she believed the volume restrictions in section 4(c) of the RRA applied to Rule 144 sales based on what Technest management told her concerning the parties' intent at the time the RRA was executed (Tr. at 275-79).

97.   O'Connor testified that she believed the parties intended Rule 144 sales to be subject to the volume restrictions because, under the RRA, Technest was obligated to have obtained an effective registration statement on or before May 2, 2005, long before any shareholders would be eligible to sell under Rule 144 (Tr. at 279).

98.   The RRA, however, expressly provided for liquidated damages in the event Technest failed to obtain an effective registration statement by May 2, 2005 (RRA § 2(b)).  Thus, the RRA anticipated the possibility that there would not be an effective registration statement by that date.

99.   O'Connor also testified that she believed the
RRA's restrictions applied to Rule 144 sales because the purpose
of the RRA was to ensure an "orderly flow" of shares into the
market; however, O'Connor admitted that the RRA did not contain
any language indicating that the parties intended the RRA to
provide for an "orderly flow" of shares into the market (Tr. at
239; O'Connor Stmnt. ¶ 6).

100.   It is also difficult to see how O'Connor, an
experienced contract and securities attorney, could have honestly
believed the subjective intent of Technest management could
supplement the express language of the RRA.

101.   "It is a fundamental principle of contract
interpretation that, absent ambiguity, the intent of the parties
must be determined from their final writing," particularly when
the agreement contains an integration clause.  In re Gulf
Oil/Cities Serv. Tender Offer Litig., 725 F. Supp. 712, 728
(S.D.N.Y. 1989), citing Int'l Klafter Co. v. Cont'l Cas. Co., 869
F.2d 96, 100 (2d Cir. 1989); see also United States Naval Inst.
v. Charter Communications, Inc., 875 F.2d 1044, 1048 (2d Cir.
1989); Enercomp, Inc. v. McCorhill Publ'g, Inc., 873 F.2d 536,
549 (2d Cir. 1989); Unisys Corp. v. Hercules Inc., 224 A.D.2d
365, 368, 638 N.Y.S.2d 461, 463 (1st Dep't 1996) (an integration
clause makes the written documents the "exclusive evidence of the
parties' intent"); Air Safety, Inc. v. Teachers Realty Corp., 185

32

Ill.2d 457, 462, 706 N.E.2d 882, 884-85 (Ill. 1999) (where
facially unambiguous contract contains an integration clause, the
parties' intent must be determined from the text of the document
without reference to extrinsic evidence); accord Pharmacy, Inc.
v. Am. Pharm. Partners, Inc., 511 F. Supp.2d 324, 328 (E.D.N.Y.
2007).  "The parol evidence rule generally prohibits the admis-
sion of extrinsic evidence of prior or contemporaneous oral
agreements to explain the meaning of a contract that the parties
have reduced to an unambiguous integrated writing." Gualandi v.
Adams, 385 F.3d 236, 241 (2d Cir. 2004).  "[A] merger clause acts
to require full application of the parol evidence rule to the
writing in question."  Bank Julius Baer & Co. v. Waxfield Ltd.,
424 F.3d 278, 283 (2d Cir. 2005).  As a competent attorney,
familiar with the law of contracts, O'Connor could not have had a
good faith belief that the parties' alleged intent could be the
source of terms that did not appear in the parties' written,
integrated agreement.

102.  I also find unpersuasive Technest's current
argument that the parties' intent was relevant to interpreting
the RRA because the RRA was ambiguous.  According to Technest,
the RRA was ambiguous because the RRA did not mention public
sales under Rule 144 (Plaintiff's Post-Trial Mem. at 6 n.6).

103.  A contract is ambiguous where "contract language
is susceptible of at least two fairly reasonable meanings."

Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir. 1983). A contract's failure to address a potential situation does not render the contract ambiguous with respect to that situation. See Kirschten v. Research Insts. of Am., Inc., 95 Civ. 7947 (DC), 1997 WL 739587 at *8 (S.D.N.Y. Sept. 24, 1997), quoting Trs. of Southampton v. Jessup, 173 N.Y. 84, 90, 65 N.E. 949, 951 (1903) ("'An ambiguity, in order to authorize parol evidence, must relate to a subject treated of in the paper, and must arise out of words used in treating that subject. Such an ambiguity never arises out of what was not written at all, but only out of what was written so blindly and imperfectly that its meaning is doubtful.'"); see also Metro. Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1515 (S.D.N.Y. 1989) ("[C]ontractual silence itself cannot create ambiguity to avoid the dictates of the parol evidence rule"). Hence, the RRA's silence with respect to Rule 144 sales does not mean that the RRA was ambiguous concerning such sales.

104. I also find that O'Connor's knowingly- or recklessly-made misrepresentations were intended to deceive Axiom.

105. On February 23, 2006, after O'Connor's conversations with Martino, Deer Creek's counsel, Bolton, sent an email to O'Connor explaining that she was mis-representing the RRA to Martino, that her misrepresentation was jeopardizing Deer Creek's

sale and that she should contact Martino and him to correct the
situation (Tr. at 100-101, 258; DX Z). O'Connor never contacted
Bolton or Martino in response to that email (Tr. at 101).

106. Bolton emailed O'Connor again on February 24,
2006, informing her that as a result of her second conversation
with Martino, Axiom was no longer willing to broker the sale of
Deer Creek's Technest shares. Bolton asked O'Connor to help Deer
Creek revive the sales by contacting Martino and explaining that
the restrictions in section 4(c) of the RRA would not apply to
Deer Creek's proposed Rule 144 sale (Tr. at 102, DX AA).
O'Connor did not respond to that email (Tr. at 102).

107. O'Connor's failure to take any corrective mea-
sures after Bolton reported to her that the information she had
given to Axiom had caused Axiom to withdraw from the transaction
demonstrates that O'Connor's misrepresentations were intentional.

108. Furthermore, I find that O'Connor was not a
credible witness. Deer Creek's counsel successfully impeached
O'Connor's testimony that she was unaware on February 23, 2006
that Deer Creek was seeking to sell its shares under Rule 144
(see Tr. at 250-52 & paragraphs 68-69 above). It is also diffi-
cult to believe O'Connor's testimony that, despite her experience
as a securities attorney, she believed the fully integrated SPA
and RRA should be interpreted according to Technest's subjective,

unspoken intent rather than applying the RRA's unambiguous language (see Tr. at 273-79; paragraphs 95-97 above).

109.   Based on the foregoing, I conclude that O'Connor either intentionally or recklessly conveyed misleading information to Axiom to induce it to withdraw from its efforts to sell Deer Creek's Technest shares.

110.   Technest argues, however, that Deer Creek still failed to establish "wrongful means" because Technest's allegedly wrongful conduct was directed at Deer Creek's agent, Axiom, rather than a third party, and that it was Axiom, and not the potential purchasers, that decided to terminate the proposed transaction (Plaintiff's Post-Trial Mem. at 3-4).

111.   To satisfy the "wrongful means" element of a tortious interference claim, the tortious conduct must have been directed at a third party, such as consumer or others with whom a claimant sought to have business relations.  See Software Ag, Inc. v. Consist Software Solutions, Inc., 08 Civ. 389 (CM)(FM), 2008 WL 563449 at *19 (S.D.N.Y. Feb. 21, 2008), citing Carvel Corp. v. Noonan, supra, 3 N.Y.3d at 190-92, 818 N.E.2d at 1103-05, 785 N.Y.S.2d at 362-63; Havana Central NY2 LLC v. Lunney's Pub, Inc., 49 A.D.3d 70, 74, 852 N.Y.S.2d 32, 35 (1st Dep't 2007).

112.   Nevertheless, Technest's argument is meritless because it mis-characterizes that facts underlying Deer Creek's

claim.  Axiom itself is the third party with whom Deer Creek sought to have an advantageous business relationship.  The prospective business relationship in issue was Axiom's brokering the sale of 157,163 of Deer Creek's Technest shares at approximately $7.00 per share.

113.  Thus, Deer Creek has established that Technest employed wrongful means when O'Connor made false and fraudulant or reckless misrepresentations to Axiom concerning the application of the volume restrictions in section 4(c) of the RRA, thereby persuading Axiom to withdraw from brokering the sale of 157,163 of Deer Creek's Technest shares.

### 4.  Deer Creek's Relationship With Axiom Was Injured

114.  Martino credibly testified that as a result of his February 23, 2006 communications with O'Connor concerning volume restrictions, he decided that Axiom would not broker a block sale of Deer Creek's Technest shares because it entailed too much risk that Axiom would be unable to sell unrestricted shares to its interested purchasers (Tr. at 61-62; Martino Dep. at 74-75).

115.  Thus, Deer Creek sufficiently established injury to its relationship with Axiom as a result of O'Connor's misrepresentations to Martino about volume restrictions.

D.  Breach of the Implied
    Covenant of Good Faith
    <u>and Fair Dealing</u>

116.  Deer Creek next alleges that Technest's wrongful conduct and interference with its relationship with Axiom was calculated to deprive Deer Creek of its rights under the SPA and the RRA to sell shares and, therefore, constituted a breach of the implied covenant of good faith and fair dealing.

117.  Under New York law, all contracts contain an implied covenant of good faith and fair dealing that prohibits one party from engaging in acts that frustrate or destroy another party's right to receive the fruits of that contract. <u>See</u> <u>State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada</u>, 374 F.3d 158, 169 (2d Cir. 2004); <u>TIG Ins. Co. v. Newmont Mining Corp.</u>, 413 F. Supp.2d 273, 281 (S.D.N.Y. 2005); <u>511 West 232nd Owners Corp. v. Jennifer Realty Co.</u>, 98 N.Y.2d 144, 153, 773 N.E.2d 496, 501, 746 N.Y.S.2d 131, 135 (2002); <u>Aventine Inv. Mgt. v. Canadian Imperial Bank of Commerce</u>, 265 A.D.2d 513, 514, 697 N.Y.S.2d 128, 128 (2nd Dep't 1999).

118.  "While the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship' . . . they do encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" <u>511 West 232nd Owners Corp. v. Jennifer Realty Co.</u>, <u>supra</u>, 98 N.Y.2d at 153, 773

N.E.2d at 500-01, 746 N.Y.S.2d at 135-36, quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304, 448 N.E.2d 86, 91, 461 N.Y.S.2d 232, 237 (1983) and Rowe v. Great Atl. & Pac. Tea Co., 46 N.Y.2d 62, 69, 385 N.E.2d 566, 569, 412 N.Y.S.2d 827, 831 (1978), respectively; accord State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, supra, 374 F.3d at 514.

119. The covenant only protects against the frustration "of the reasonable expectations and inferences otherwise derived from the agreement." Net2Globe, Inc. v. Time Warner Telecom of New York, 273 F. Supp.2d 436, 466 (S.D.N.Y. 2003), citing Sauer v. Xerox Corp., 95 F. Supp.2d 125, 132 (S.D.N.Y.2000) ("[S]uch a claim may be brought . . . only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain.").

120. Deer Creek argues that the purpose of the SPA and the RRA was to allow investors to convert their preferred stock into common shares, exercise warrants to purchase additional shares and then sell their shares; therefore, Technest's actions injured Deer Creek's right to receive the fruits of their contract (Defendant's Pretrial Memorandum of Law at 12).

121. Technest's contends that Deer Creek cannot prevail on this claim because it could not reasonably have expected to be able to sell shares without volume restrictions.

Technest bases this contention on the fact that under the terms
of the RRA, Technest was obligated to obtain an effective regis-
tration statement by May 2, 2005 -- several months before Deer
Creek would be permitted to sell its shares pursuant to SEC Rule
144, which requires a one-year holding period.  According to
Technest, since Deer Creek expected Technest would honor this
obligation, (Sharinn Dep. at 35, Tr. at 121), Deer Creek could
not have expected to have the right to sell unregistered shares
that were not subject to the volume restrictions set forth in
section 4(c) of the RRA (Plaintiff's Pretrial Memorandum of Law
at 10-11).

        122.  As noted above, the RRA provided for liquidated
damages in the event that Technest failed to obtain a registra-
tion statement by May 2, 2005 (RRA § 2).  Thus, the parties did
contemplate the possibility that Technest would fail to obtain an
effective registration statement by May 2, 2005 (Sharinn Dep. at
34-35).

        123.  Second, Technest can point to no language in
either the RRA or the SPA that suggests investors could only sell
shares pursuant to a registration statement or that limits the
sales that could be made in the absence of a registration state-
ment, and, as explained above, the agreements are not ambiguous.
The terms of the RRA, prior to the February 27, 2006 amendment,
clearly did not impose volume restrictions on the sale of shares

pursuant to Rule 144. The SPA, to which the RRA is attached, plainly states that the SPA and its attachments are the "entire agreement" of the parties notwithstanding all prior oral or written agreements or understandings (SPA; Tr. at 118).

124. When parties to a contract have "set down their agreement in a clear, complete document," the parties are entitled to rely on the express terms of the writing. See Vermont Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765, 767 (2004); accord TAG 380, LLC v. Commet 380, Inc., 10 N.Y.3d 507, 512-13, 890 N.E.2d 195, --, 860 N.Y.S.2d 433, 436 (2008).

125. Furthermore, Sharinn testified that prior to the execution of the SPA and the RRA, Deer Creek never engaged in discussions about limiting sales made pursuant to Rule 144 and, therefore, never contemplated that such sales would be subject to limitations not set forth in the SPA or the RRA (Sharinn Stmnt. ¶¶ 30-31; Sharinn Dep. at 33).

126. For these reasons, I conclude that it was reasonable for Deer Creek to expect that a sale of its shares pursuant to Rule 144 would not be subject to the volume restrictions set forth in the RRA.

127. Technest next argues that because the RRA could be amended at any time by a majority of shareholders to impose volume restrictions on sales not made pursuant to a registration

statement, Technest's communications with Martino were within its contractual rights (Plaintiff's Pretrial Memorandum of Law at 10-11). If the RRA had been amended prior to O'Connor's calls to Martino, this argument might have force. The fact that the RRA could be freely amended simply does not imply a right to misrepresent its terms.

128. Finally, Technest argues that Deer Creek has failed to establish breach of the implied covenant of good faith and fair dealing because Technest acted in reliance on its own good-faith interpretation of the RRA (Plaintiff's Pretrial Memorandum of Law at 10-11). As I concluded in the previous section that O'Connor intentionally or recklessly misrepresented the terms of the RRA to Martino in order to persuade Axiom from brokering sales of Deer Creek's shares, I cannot conclude that Technest's actions were taken in good faith.

129. For these reasons Deer Creek has sufficiently established that Technest violated the implied covenant of good faith and fair dealing by frustrating Deer Creek's attempts to sell shares in accordance with the terms of the RRA.

E.  The Common Law Duty to
    Process the Transfer of Stock

130. Deer Creek next argues that O'Connor's interference with its relationship with Axiom constitutes a breach by Technest of the common law duty to process the transfer of stock.

131. Technest's memoranda do not address this counter-claim.

132. Under New York law, a corporation may not refuse to process a transfer its stock unless it has reasonable grounds for doing so and acts in good faith. Diversified Earth Scis., Inc. v. Hallisey, 73 Civ. 816 (AB), 1973 WL 401 at *3 (S.D.N.Y. June 12, 1973) (Company's telegram to shareholders stating "'no further transfer of your shares of stock [in Diversified] will be permitted'" was an unjustified refusal to transfer stock.); see also Gasarch v. Ormand, 346 F. Supp. 550, 551-52 (S.D.N.Y. 1972) (Plaintiff shareholder entitled to damages where the defendant company's transfer agent, on instruction from the defendant, refused to exchange plaintiff's stock for unlegended shares despite plaintiff's presentation to the agent of a letter from the SEC establishing the legality of the transfer.); Riskin v. Nat'l Computer Analysts, Inc., 37 A.D.2d 952, 952, 326 N.Y.S.2d 419, 420 (1971) (Defendant's counsel's withholding of his opinion concerning the transfer of shares for which the SEC had issued a "no-action" letter was unreasonable and in bad faith.).

133. In this case the conduct by Technest that Deer Creek alleges constitutes breaches of the duty to transfer stock are the internal determination by Technest that it would not allow sales beyond section 4(c)'s volume restrictions, O'Connor's misleading representations to Axiom, and the representation that

43

Technest would not transfer shares beyond the 3,130 share limitation, causing Axiom to withdraw from brokering Deer Creek's sale. None of these, however, constitutes an actual refusal to transfer shares.

134. Hence, Deer Creek has not proven the elements of this counterclaim.

F. <u>Damages</u>

135. Deer Creek alleges damages totaling $543,370.05, representing the $7.00 per share proceeds it would have earned had it been able to sell its 157,163 shares through Axiom in February, 2006 ($1,100,141) less Deer Creek's proceeds from the actual sales of those shares between February 2006 and January 2007 pursuant to the volume restrictions in section 4(c) of the amended RRA ($556,770.95) (Defendant's Pretrial Memorandum of Law at 8-9; Sharinn Stmnt. ¶¶ 65-66; DX EE).

136. Technest does not dispute the amount of Deer Creek's proceeds from its sale of 157,163 Technest shares between February 2006 and January 2007. Nor does Technest dispute the amount potential purchasers were willing to pay for the shares on February 23, 2006.

137. Rather, Technest argues that Deer Creek failed to mitigate its damages (1) by not finding other buyers in February 2006, (2) by not finding another broker in February 2006, (3) by

not attempting to sell its restricted shares to the same buyers that Axiom had accumulated at a lower price and (4) by later selling the maximum amount of allowable shares per day, driving down the share price (Plaintiff's Proposed Findings of Fact and Conclusions of Law ¶¶ 47-51).

138.  During trial Technest also claimed that the stock Deer Creek received after February 2006 as liquidated damages pursuant to section 2(b) of the amended RRA mitigated Deer Creek's damages (Tr. at 199-215).

139.  A party injured by a breach of contract has a duty to mitigate its damages by making reasonable efforts to minimize the harm flowing from the injury.  Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 110 n.21 (2d Cir. 2007) ("The non-breaching party [to a contract] is, of course, under a duty to mitigate damages to the extent practica-ble"); Drummond v. Morgan Stanley & Co., Inc., 95 Civ. 2011 (DC), 1996 WL 631723 at *2 (S.D.N.Y. Oct. 31, 1996) ("It is well settled that a plaintiff who suffers injury as the result of a breach of contract is under a duty to mitigate damages").  A tort plaintiff may also be obligated to mitigate its damages.  Lamarca v. United States, 31 F.Supp. 2d 110, 131 (E.D.N.Y. 1998) (ad-dressing the duty of surviving spouse in wrongful death action to mitigate her damages); De La Concha v. Fordham Univ., 28 A.D.3d 963, 964, 814 N.Y.S.2d 320, 321 (3rd Dep't 2006) (finding that,

generally, a party inured by another's tort is required to
minimize its damages); <u>Mullen v. Jacobs</u>, 58 Misc.2d 64, 70, 294
N.Y.S.2d 636, 643 (1st Dep't 1968) (injured tort plaintiff under
duty to minimize damages).

140.   The party alleging a failure to mitigate bears
the burden of proving the injured party's willful or negligent
failure to make reasonable efforts to mitigate its injury.
<u>Cornell v. T.V. Dev. Corp.</u>, 17 N.Y.2d 69, 74, 215 N.E.2d 349,
352, 268 N.Y.S.2d 29, 33 (1966); <u>Norske Ameriekalinje v. Sun
Printing & Publ'q Ass'n</u>, 226 N.Y. 1, 10, 122 N.E. 463, 466
(1919); <u>Baginski v. New York Tel. Co.</u>, 130 A.D.2d 362, 366, 515
N.Y.S.2d 23, 26 (1st Dep't 1987); <u>Alford v. Niagara Mohawk Power
Corp.</u>, 115 A.D.2d 924, 925, 496 N.Y.S.2d 820, 822 (3d Dep't
1985); <u>Golbar Properties, Inc. v. North Am. Mortg. Investors</u>, 78
A.D.2d 504, 504, 431 N.Y.S.2d 820, 822 (1st Dep't 1980).

141.   "Reasonable efforts" are efforts conducted with
reasonable skill, prudence and efficiency.  <u>Norske Ameriekalinje
v. Sun Printing & Publ'q Ass'n</u>, <u>supra</u>, 226 N.Y. at 9, 122 N.E. at
465.

142.   Sharinn testified that after Axiom decided not to
proceed with the sale of Deer Creek's Technest shares, Deer Creek
sought to maximize its proceeds by selling its shares under Rule
144 and in accordance with the daily volume limitations in
section 4(c) of the RRA (Tr. at 137-38).  Axiom sold some of Deer

Creek's shares while the market price was strong, and then Deer Creek transferred the remaining shares to vFinance (Tr. at 134-36, 38; Brous Dep. at 24-25). Sharinn believed that vFinance would get a better price for the shares because it was a "market maker" (Tr. at 134-36).

143. Deer Creek continued to sell close to the maximum number of shares allowable as rapidly as it could, even though the stock price was, at times, very low (DX EE).

144. Technest offered absolutely no evidence that after February 23, 2006, there were other reasonable steps Deer Creek could have taken to increase its proceeds. Technest merely hypothesizes that if Deer Creek had not sold its shares at the pace it did, then perhaps Deer Creek could have netted greater proceeds from its shares. Such abstract guess work does not satisfy Technest's burden of showing Deer Creek failed to mitigate its injury. See Katz Communications, Inc. v. Evening News Ass'n, 705 F.2d 20, 26 (2d Cir. 1983) ("[T]he burden is on the appellants to prove any potential item in mitigation of damages inasmuch as it is pro tanto a defense to the claim of the wronged party."), citing Jenkins v. Etlinger, 55 N.Y.2d 35, 39, 432 N.E.2d 589, 591, 447 N.Y.S.2d 696, 698 (1982); Cornell v. T.V. Dev. Corp., supra, 17 N.Y.2d at 74, 215 N.E.2d at 352, 268 N.Y.S.2d at 33.

145.   Technest also claims that because Deer Creek received approximately $255,000 worth of stock as liquidated damages that Deer Creek would not have received had it sold 157,163 of its shares in February 2006, Deer Creek's alleged damages should be reduced by that amount (Letter from Howard Fischer, Esq. to the undersigned, dated April 8, 2008 ("April 8, 2008 Fischer Letter"); Tr. at 199-215).

146.   Before Technest and Deer Creek consented to my trying this case, the matter had been assigned to the Honorable P. Kevin Castel, United States District Judge.  This case was on Judge Castel's docket when the parties submitted their Joint Pretrial Order.  The Individual Practices of Judge Castel require that the Pretrial Order include "[a] brief summary by each party of the claims and defenses that the party has asserted which remain to be tried . . . .  Any claim or defense not so identi-fied is deemed withdrawn" (§ 3(A)(ii)).

147.   In the Pretrial Order, Technest asserted that it would prove several affirmative defenses either rebutting or mitigating Deer Creek's claims.  Among those was that "Deer Creek failed, at several points, to take reasonable efforts to mitigate its damages" (Joint Pretrial Order at 5).  Technest did not assert that Deer Creek's alleged damages should be diminished as a result of its receipt of shares of liquidated damages after February 2006.

148. Technest argues that it should, nevertheless, be permitted to assert this defense even though it was not raised before trial.

149. First, Technest argues that it should be permitted to assert this defense because it did not know until November 15, 2007 the total damages Deer Creek was alleging (April 8, 2008 Fischer Letter). This argument is without merit.

150. Sharinn's original witness statement, dated January 9, 2007, stated "[t]o date, Deer Creek has sold [blank] shares for proceeds of [blank dollars]. . . . Accordingly, Deer Creek has suffered damages of [blank dollars]" (Sharinn Stmnt. ¶¶ 65-66). The statement noted that the missing information would be added at a later date.

151. On November 15, 2007 Deer Creek's counsel submitted an amended witness statement for Sharinn that indicated Deer Creek had "sold 157,163 shares for proceeds of $556,798.81" resulting in "damages of $543,342,19" (Sharinn Stmnt. at ¶¶ 65-66). Deer Creek explained that the numbers were left out of the previous version of Sharinn's witness statements because, at the time of that submission, Deer Creek had not yet sold all of its shares, and, therefore, could not ascertain the full extent of its damages (April 8, 2008 Fischer Letter, discussing Deer Creek's November 15, 2007 Letter to the undersigned).

152.  Technest's claim that Sharinn's original state-
ment, which included blank spaces for certain numbers, failed to
put Technest on notice concerning Deer Creek's method for calcu-
lating damages is unpersuasive.  Even if I assume, however, that
Technest could not have foreseen this issue until after November
15, 2007, Technest has completely failed to explain why it
delayed until the first day of trial to assert that the shares
issued as liquidated damages mitigated Deer Creek's damages.

153.  Technest also attempts to characterize this
defense as a mitigation theory encompassed by the defenses set
forth in the Joint Pretrial Order.  This argument is also unper-
suasive.  The Pretrial Order focused on Deer Creek's conduct,
alleging that Deer Creek's damages should be lessened because
"Deer Creek failed . . . to take reasonable efforts to mitigate
its damages" (PTO at 5).  Technest's claim that Deer Creek
received compensation through other means is simply not a claim
that Deer Creek failed to take certain actions.  It is a differ-
ent theory concerning damages that Technest abandoned by omitting
it from the Joint Pretrial Order.

154.  When a party seeks to introduce mitigation
evidence relating to matters that were not raised before the
first day of trial, the Court may exclude that evidence on the
ground that considering it would be unduly prejudicial to the
other party.  See TVT Records v. Island Def Jam Music Group, 254

F. Supp.2d 322, 325 (S.D.N.Y. 2003). There are several reasons why consideration of Technest's evidence concerning Deer Creek's receipt of liquidated damages would be unduly prejudicial.

155. To ensure a complete record at trial, I permitted Technest to introduce evidence, over Deer Creek's objection, in support of Technest's theory for lesser damages (Tr. at 214). Technest had presented O'Connor's testimony that Deer Creek had received a total of $355,000 worth of stock, or approximately 116,000 to 118,000 shares pursuant to the RRA's provision for liquidated damages (Tr. at 191). O'Connor later testified, however, that she not sure how many shares Deer Creek received as liquidated damages after February 23, 2006; she estimated it was "over 100,000" (Tr. at 228).

156. O'Connor testified that Deer Creek could not publicly sell the liquidated damages shares until the end of September 2006 (Tr. at 218-19). O'Connor was also not sure if, after September 2006, Deer Creek could have sold the liquidated damages shares when it received them, or if the shares would have been independently subject to Rule 144's one-year holding period (Tr. at 226). O'Connor also did not know how much money Deer Creek made from liquidated damages shares it had received after February 2006 (Tr. at 227).

157. When Technest questioned Pereira, Technest's Chief Financial Officer, concerning Deer Creek's receipt of

liquidated damages, Deer Creek's counsel objected to his answers on hearsay grounds (Tr. 333-34). I subsequently denied Technest's attempt to introduce documentary evidence -- copies of stock certificates -- to supplement or bolster Pereira's testimony because those copies were single-sided while the certificates would have been double-sided (Tr. at 338-41). Thus, the certificates offered were incomplete; they also had not been identified in the Pretrial Order. In the end, Pereira offered no testimony to help clarify the liquidated damages issue.

158. Given Technest's failure to establish how much money Deer Creek actually made from the shares received as liquidated damages after Technest interfered with the February 2006 block sale, and Technest's untimely introduction of its theory that Deer Creek's damages should be lessened by that amount, I find that consideration of that argument would be unduly prejudicial. Hence, I will not reduce Deer Creek's damages as a result of its having received an unspecified amount of liquidated damages after February 2006.

159. Finally Technest argues that it should be able to assert this defense because the Joint Pretrial order "permits modification . . . to 'prevent manifest injustice'" (Fischer Letter, quoting Joint Pretrial Order ¶ 5). This argument is baseless since Technest is not seeking to modify the Joint Pretrial Order, but rather to assert, in the middle of the trial,

a previously undisclosed theory based on circumstances not previously raised in this action.

160. For the above reasons I conclude Technest has failed to establish Deer Creek's damages should be lessened as a result of any failure to mitigate or because Deer Creek may have received additional shares it would not have otherwise under section 2(b) of the amended RRA.

161. Deer Creek bases its damages calculations on the premise that had it been able to complete a block sale of its Technest stock through Axiom, Deer Creek would have earned proceeds of $7.00 a share for 157,163 shares. The documentary evidence in this case has shown, however, that Deer Creek would have netted $6.95 per share (DX W). Therefore, the amount of Deer Creek's damages is $535,484.04 -- the proceeds Deer Creek would have received from a block sale on or about February 23, 2006 ($1,092,282.85 or 157,163 shares x $6.95 per share) minus the proceeds Deer Creek actually made from selling those shares ($556,798.81).

162. Accordingly, Technest is liable to Deer Creek for damages in the amount of $535,484.04.

G. Prejudgment
   Interest

163. Plaintiff also seeks interest from February 24, 2006 to the date judgment is entered.

164. In <u>Wechsler v. Hunt Health Systems, Ltd.</u>, 330 F.
Supp.2d 383, 434-35 (S.D.N.Y. 2004), the Honorable Peter K.
Leisure, United States District Judge, set forth the principles
applicable to an award of prejudgment interest in a diversity
case such as this:

> In diversity actions, the awarding of prejudgment
> interest is considered a substantive issue and is,
> therefore, governed by state law. <u>See</u> <u>Schwimmer v.</u>
> <u>Allstate Ins. Co.</u>, 176 F.3d 648, 650 (2d Cir. 1999).
> New York law provides that "Interest shall be recovered
> upon a sum awarded because of a breach of performance
> of a contract." N.Y. CPLR § 5001 (McKinney 1992). In
> an action at law for breach of contract, "prejudgment
> interest is recoverable as of right." <u>Trademark Re-</u>
> <u>search Corp. v. Maxwell Online, Inc.</u>, 995 F.2d 362, 342
> (2d Cir. 1993); <u>see</u> <u>Barry v. Atkinson</u>, No. 96 Civ.
> 84436, 1999 WL 605422, at *9 (S.D.N.Y. Aug. 10, 1999).
> New York's prejudgment interest rate for breach of
> contract cases is 9% per annum, which accrues on a
> simple, rather than a compound, basis. <u>See</u> N.Y. CPLR §
> 5004; <u>Marfia v. T.C. Ziraat Bankasi</u>, 147 F.3d 83, 90
> (2d Cir. 1998) ("New York courts have held that in a
> breach of contract action of this sort prejudgment
> interest must be calculated on a simple interest basis
> at the statutory rate of nine percent." (citing <u>Patane</u>
> <u>v. Romeo</u>, 235 A.D.2d 649, 652 N.Y.S.2d 142, 144 (3d
> Dep't 1997); <u>Kaufman v. Le Curt Constr. Co.</u>, 196 A.D.2d
> 577, 601 N.Y.S.2d 186, 187, 188 (2d Dep't 1993))).

> Prejudgment interest "shall be computed from the
> earliest ascertainable date the cause of action ex-
> isted, except that interest upon damages incurred
> thereafter shall be computed from the date incurred.
> Where such damages were incurred at various times,
> interest shall be computed upon each item from the date
> it was incurred or upon all of the damages from a
> single reasonable intermediate date." N.Y. CPLR §
> 5001(b); <u>see</u> <u>Conway v. Icahn & Co.</u>, 16 F.3d 504, 512
> (2d Cir. 1994). "Accordingly, where damages are in-
> curred at various times after the cause of action
> accrues, section 5001 grants courts wide discretion in
> determining a reasonable date from which to award pre-
> judgment interest." <u>Conway</u>, 16 F.3d at 512.

See also <u>Dollar Rapido, Inc. v. eCHEX Int'l, Inc.</u>, 04 CV 3280 (NGG)(CLP), 2006 WL 985630 at *6 (E.D.N.Y. Apr. 14, 2006) (adopting Report and Recommendation); <u>Diamant v. Dynasty Diamond & Jewelry Group Corp.</u>, 04 CV 3844 (GBD)(DF), 2006 WL 728802 at *4 (S.D.N.Y. Mar. 20, 2006) (adopting Report and Recommendation); <u>Brassco, Inc. v. Klipo</u>, 99 Civ. 3014 (PAC), 2006 WL 223154 at *20 (S.D.N.Y. Jan. 27, 2006); <u>EMI Music Marketing v. Avatar Records, Inc.</u>, 364 F. Supp.2d 337, 344 -345 (S.D.N.Y. 2005); <u>Donovan v. Dairy Farmers of Am., Inc.</u>, 53 F. Supp.2d 194, 197-98 (N.D.N.Y 1999).

165.  Under New York Law, every contract implies good faith and fair dealing between the parties to it.  <u>See</u> <u>e</u>.<u>g</u>. <u>State Street Bank & Trust Co. v. Inversiones Errazuriz Limitada</u>, <u>supra</u>, 374 F.3d at 169.

166.  A party is entitled to prejudgment interest when another party's performance constitutes a breach of a contract that is express or implied.  <u>See</u> <u>e</u>.<u>g</u>. <u>In re Estate of Klink</u>, 278 A.D.2d 883, 883, 718 N.Y.S.2d 758, 760 (4th Dep't 2000) ("A party recovering damages on a claim for breach of an implied contract is entitled to predecision interest.").

167.  It follows that prejudgment interest is appropriate where a party breaches the implied covenant of good faith and fair dealing.

168.  I find, therefore, that Deer Creek is entitled to recover prejudgment interest on its damages.

169.  The breach occurred on February 23, 2006 for a transaction that would otherwise have occurred shortly thereafter; I will, therefore, use Deer Creek's suggested date of February 24, 2006 as the date from which to calculate prejudgment interest.

170.  Deer Creek is entitled prejudgment interest from February 24, 2006 until the entry date of final judgment, accruing on a simple interest basis at a rate of 9% per year.  N.Y. C.P.L.R. 5001, 5004; <u>Marfia v. T.C. Ziraat Bankasi</u>, 147 F.3d 83, 90 (2d Cir. 1998).

171.  Deer Creek's damages are $535,484.04.  At 9% per year calculated on a simple interest basis, Deer Creek is owed $48,193.56 per year, or $132.04 per day, in prejudgment interest on the award.  Thus, from February 24, 2006 until the date of this Order, which is two years and 170 days, Deer Creek is owed $118,833.92 in prejudgment interest.  The Clerk of the Court is instructed to add an additional $132.04 per day to this amount from the date of this Order to the final entry date of judgment.

IV.  <u>Conclusion</u>

172.  Accordingly, for all the foregoing reasons, I find Technest is liable to Deer Creek for tortious interference

with Deer Creek's prospective business relationship with Axiom and for breach of the implied covenant of good faith and fair dealing.

173. I find that Technest is not liable for breach of the common law duty to transfer stock.

174. Technest is, therefore, liable to Deer Creek for damages totaling $535,484.04 and prejudgment interest in the amount of $118,833.92 plus another $132.04 per day from the date of this Opinion and Order until the final entry of judgment.

175. I also express my gratitude to counsel for both sides for the excellence of their presentations and for their consistently professional conduct. The care and attention to detail that went into both sides' oral presentations and written submissions was obvious and was greatly appreciated.

Dated:   New York, New York
         August 12,2008

                                    SO ORDERED

                                    HENRY PITMAN
                                    United States Magistrate Judge

Copies transmitted to:

Howard A. Fischer, Esq.
Schindler Cohen & Hochman
100 Wall Street
New York, New York 10005

David Bolton, Esq.
666 Old Country Road, Suite 509
Garden City, New York 11530